CHARLES FRANK, TRADING AS WOODBRIDGE MONUMENT WORKS, PLAINTIFF, v. CLOVER LEAF PARK CEMETERY ASSOCIATION, A CORPORATION, DEFENDANT.

CLOVER LEAF PARK CEMETERY ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF, v. CHARLES FRANK, TRADING AS WOODBRIDGE MONUMENT WORKS, DEFENDANT.

LAKE NELSON MEMORIAL PARK ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF, v. CHARLES FRANK, TRADING AS WOODBRIDGE MONUMENT WORKS, DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided December 19, 1957.

*Mr. Irving L. Hodes* tried the cause for Mr. Charles Frank and his companies (*Messrs. Hodes & Hodes,* attorneys).

*Mr. Samuel Kaufman* tried the cause for the memorial park associations (*Mr. John M. Kaufman* and *Mr. Andrew L. Kaufman,* on the brief; *Messrs. Kaufman, Kaufman & Kaufman,* attorneys).

*Mr. David Landau,* Deputy Attorney-General, appearing for *Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, *amicus curiae.*

SCHETTINO, J. S. C.  Plaintiff Frank has filed actions against the memorial park associations to determine the effect and the reasonableness of the rules and regulations of the associations.  In the consolidated suits the associations seek to enjoin Frank from using or advertising names similar to theirs and to enjoin him from holding himself out as in any way connected with the associations.  The parties agreed that the decision in the Clover Leaf Park Cemetery Association cases would apply to the Lake Nelson Memorial Park Association case.  I shall therefore only refer to Clover Leaf Park Cemetery Association in my opinion.

Frank alleges that since 1929 he has been in the business of selling and installing all kinds of bronze and granite markers and plaques; that his place of business is located near the cemetery of the defendant association; that he has sold markers to lot owners of the cemetery association; that he has been unable to install the markers by virtue of defendant's conduct; that defendant has been guilty of acts which are *ultra vires* and as a result plaintiff has suffered continual, extensive and irreparable loss and damage; that the defendant is unlawfully engaged in the business of selling bronze memorials at a profit; that the rules of the cemetery are being enforced in an unreasonable manner; that plaintiff's customers have been persuaded by defendant to withdraw from contracts made with plaintiff; that plaintiff has been deprived of a substantial amount of business and that defendant, who is exempt from the payment of certain taxes, has a preferred position; that plaintiff has been unable to deal with potential customers by reason of defendant's actions; that the defendant's conduct has been unlawful and illegal in that it has committed a business tort; that such conduct is against public policy insofar as it constitutes a restraint of trade and a monopoly by reason of the fact that defendant has illegally and improperly reserved unto itself the exclusive right to sell and erect such markers, thus depriving plaintiff of his right to secure legitimate business from potential and actual customers, and the un-

lawful conduct of the defendant constitutes a menace to free enterprise thus enabling defendant to compete unfairly with plaintiff; and that plaintiff is thus denied the right to pursue his business free from undue interference or molestation.

Clover Leaf Park Cemetery was organized on August 12, 1927 as a memorial park cemetery, under "An act to authorize the incorporation of rural cemetery associations and regulate cemeteries," approved April 9, 1875 (now codified in *Title* 8, *N. J. S. A.*) and is a corporation not for pecuniary profit. It enjoys a tax-free status on lands where interments are made and pays taxes on the remainder of its lands. It is governed by its lot owners who elect trustees pursuant to the statute. Early in the history of the cemetery, rules and regulations were adopted by the trustees and approved by the lot holders. Each deed to a lot holder is specifically made subject to the rules and regulations of the association. Defendant's operation differs from the conventional cemetery where the graves are marked by headstones of various heights, sizes, and dimensions. This cemetery is laid out as a park, with markers installed flush with the ground; all the markers are made of bronze with the exception of veterans' markers which are supplied by the Government. The alleged purpose of the establishment of the cemetery as stated in its rules and regulations was the creation of a memorial park.

Defendant's testimony shows that it has on display, and for sale and installation, certain brands of bronze markers. A lot owner may, if he desires, choose one of them and pay to defendant one charge including sales cost, and a charge for installation and maintenance. The memorials are cleaned on occasion; the markers are raised or lowered as the situation demands, because their positions are affected by weather and age; dead flowers are removed from flower containers periodically; and the grounds around the marker are specially trimmed. The record shows that defendant memorial park has spent thousands of dollars on its beautification program, and although there is some conflict in

testimony, I find that it is beautifully laid out and maintained.

These services are performed by the cemetery by virtue of the maintenance charge included in the lot owner's original purchase of the bronze marker. Defendant maintains a "Perpetual Care Fund" made up of some of the proceeds from the sale of grave *plots* covering maintenance and care of the *grounds*. This fund is supervised and examined by the New Jersey Department of Banking and Insurance.

The testimony shows that defendant permits any lot owner to furnish a marker for the lot owner's plot even if it is not purchased from defendant, provided it conforms to the specifications prescribed by the rules and regulations of defendant. However, defendant requires the installation of the marker and the maintenance thereafter to be performed by it. The charge for the installation and subsequent maintenance is a fixed one, and no matter from whom the marker is purchased, the listed charges are the same.

Plaintiff's charges, reduced to their essence, are to the effect that defendant cemetery is unlawfully selling bronze memorials for profit; that defendant's rules and regulations have been so enforced as to prevent potential customers from purchasing memorials from the plaintiff; and that defendant unlawfully refuses to permit the plaintiff to install bronze memorials.

The testimony shows that defendant association sold bronze markers since its inception and that, exclusive of veterans' markers, in 1952, 92 markers were sold and installed by defendant; in 1953, 126 markers were installed, and that of these defendant sold 126; in 1954, defendant sold and installed 167 markers; and in 1955, defendant sold and installed 198. The bronze markers are bought from two sources, Matthews and Gorham, and the formula contained in defendant's rules and regulations relating to markers to be installed was furnished by these two suppliers.

Defendant has a salesman in charge of the bronze marker division. He stated that he solicits business from lot owners

as soon as he is handed a card showing defendant's record of a deceased person. He then sees to it that a letter is mailed to the deceased person's family by defendant's office staff. At times a letter is mailed even before the funeral and defendant's brochure is thereafter sent out four to five days after the burial and in about a week or ten days, or two weeks, he personally calls upon the family.

Defendant's office manager testified that the 1955 cost of a bronze marker, including installation and maintenance, of $195 was arrived at as follows:

| | |
|---|---|
| Cost of Marker .................................. | $57.00 |
| Salesman's commission ........................... | 51.25 |
| Maintenance expense (including material, wages, depreciation of equipment, taxes on payroll, compensation insurance and all other expenses pertaining thereto) .............. | 44.95 |
| Clerical, bookkeeping, and general overhead ......... | 15.65 |
| Reserve for replacement due to theft, loss, damage ....................................... | 5.50 |
| Surplus to cover future rising costs and other maintenance contingencies ................... | 20.65 |

Defendant's manager admitted that defendant had no cost system to enable it to determine the cost to it of the preparation of the grave, the foundation, the installation of the monument, and the perpetual care and maintenance. Defendant's manager, a woman, determined the cost of maintenance by some over-all formula; that 10% of the cost of the bronze is set aside for scrolls and for replacements; that the bookkeeping system used is such that all other monies go into the operating account regardless of source, and are paid out for "everything," and that no "Perpetual Maintenance Fund" as so entitled has been established from the proceeds of the sale of bronze markers. On the record, I feel that the breakdown figures were for the most part established after this litigation was instituted. Regardless of the absence of such itemized charges prior to suit, the court must determine whether or not such charges are so unreasonable as to set them aside.

Defendant argues that plaintiff has not proved that the price is excessive. Defendant uses the $195 price for the year 1955 of the 24″ x 16¾″ marker as an example. The examination of the breakdown of that figure reveals only that defendant has equated its price with what it has estimated its cost of installation and future maintenance of the marker to be, and that plaintiff's principal charge of excessiveness seems to relate to the surplus of $20.65. Defendant's office manager testified twice about that figure that it was a reserve against contingencies of rising costs over a period of years; that maintenance and other expenses have been steadily on the uprise and that a reserve was needed that would protect defendant in the future, and whether it would be right or wrong or whether it would compensate defendant for any errors in those calculations, defendant did not know but hoped that it would, and since no additional charge could be made in the future if the price of maintenance increased, some provision had to be made against future contingencies. Defendant quite properly is attempting to guard itself against inflationary price increases and I find the charge is not excessive.

Plaintiff's second claim is that defendant has enforced its rules and regulations in such manner as to bar a sale of markers by plaintiff to any prospective customer. Plaintiff testified that the first two contracts he ever took from lot owners of the defendant were the families Ur and Cromwell, and that oddly enough these two lot owners were the only persons who ever received free bronze markers from defendant; that for Ur defendant installed the marker for nothing, and for Cromwell defendant charged only $38. There was also a line of testimony from plaintiff about his efforts to sell a bronze marker to another lot owner and his being told by defendant's agent to stick to the granite business and let defendant stick to the bronze marker business.

Plaintiff also testified that he never was informed he could sell the markers to lot owners nor told about the

requirements for installation. He never saw, nor was he ever shown, a schedule of prices as testified to by defendant's manager. He claimed that he had about 15 inquiries yearly from lot owners of defendant, but that he could not take their orders for bronze markers because of defendant's instructions.

One of plaintiff's witnesses, a monument dealer, stated that he, too, could not sell a bronze marker to a lot owner. He had orders but could not fill them; that when he inquired about costs from defendant, he was told that his prospective customer would have to call the cemetery office; that when he talked to defendant's superintendent, he was referred to the office, and when he talked to the office he was sent back to the superintendent; that when he asked for costs of installation, he was told nothing except that the cemetery put the markers in. He further stated that other cemeteries in the area charged about $40 for installation and foundation. But this witness admitted he had a copy of defendant's rules and regulations and knew that a lot owner could buy a marker from any one and that the cemetery installed the bronze markers.

Plaintiff also submitted testimony of lot owners who stated, in part, that defendant's agents told them that no outsider could install bronze markers; in part, that plaintiff would not be permitted to install markers, and finally to go get their money back from plaintiff. One witness testified that she had never been told by defendant's agents that perpetual maintenance was involved. Another one of plaintiff's witnesses testified concerning the visit of defendant's bronze salesman to her house; that although at first she thought he was telling her that she could not buy a bronze marker elsewhere, he assured her she could buy it from any one but to be careful because she might not get perpetual care for the monument.

Defendant's by-laws, in section 23, provide that lot owners may supply bronze memorial plaques, provided only that they conform to the association's specifications. Defendant's office manager testified that she had never told any one,

including plaintiff, that any certain plaque would not be acceptable to the association.

I conclude from an analysis of the testimony that defendant, through its agents, has not violated section 23 of its by-laws; and that it did not prevent lot owners from purchasing bronze markers elsewhere, but that defendant did insist on compliance with its rules and regulations that installation and future maintenance be performed by it.

Plaintiff's third charge is that defendant's requirement that it install and maintain bronze markers, and defendant's refusal to permit the plaintiff to install markers is unlawful. The testimony on this issue was of two sorts: testimony by witnesses of both plaintiff and defendant as to the correct way to set markers; testimony of witnesses of the defendant as to the reasons why such a rule was necessary for the preservation of the cemetery. Plaintiff and two of his witnesses detailed what they believed to be the proper method of setting a bronze marker. Plaintiff and one of his witnesses testified that the installation method employed by defendant was not the proper method. Plaintiff and his witnesses have been in the monument business for many years, the vast bulk of their business in dealing with conventional granite monuments with limited experience with bronze memorials. Plaintiff's experience in the bronze marker field is not extensive.

Defendant's agents and outside expert witnesses testified concerning the method of installation used by defendant and by other memorial parks, and the reasons why defendant's method was used in preference to all others including the one advocated by plaintiff. Defendant has proved that memorial parks throughout the country use the method of setting markers employed by it, and that, in the opinion of a memorial park cemetery expert, this method is the most practical method.

I was impressed by the expert testimony on behalf of both sides. Each method appeared to have—in some respects —an advantage over the other. I find that defendant's method has great merit, and no court has the right to

interfere with the operation of a corporation if the issue is purely of business and economical problems. If so, the problems are to be determined by the directors and not by the court; *Riddle v. Mary A. Riddle Co.*, 140 *N. J. Eq.* 315, 319–323 *(Ch.* 1947). I find no basis for interference as to the method of installation and maintenance.

Plaintiff also complains about defendant's rule that only it may do the installation of markers. Defendant's expert witness testified that memorial parks were started to eliminate the "expanse of tombstones and monuments in any area of the cemetery," and "were started with the idea of making them places of beautification whereby they would all be done in park-like fashion with men skilled in their trades to lay out the memorial park, to plan its plantings and its features, etc., and to memorialize the grave or identify it with a flat bronze marker set flush with the lawn." Defendant's expert testified that even in traditional cemeteries where a monument man is allowed to do some work, these cemeteries, at least the well-run ones, insist on building the foundation themselves and all the monument man does is to put in his tombstone on the foundation built for him by the cemetery. But the work of installing a conventional monument involves markers of hundreds of pounds in weight. The bronze markers are comparatively small in size and light in weight. If outsiders can install huge granite monuments, it is unreasonable to hold that bronze markers cannot be installed by outsiders under the supervision of defendant's agent at a time and day reasonably convenient to defendant. No harm could come to defendant especially if a reasonable charge is made for supervisory installation services.

The defendant could require, by proper notice, the method of installation as testified to by its witnesses regardless of an outsider's opinion of the method he desired to use. Defendant could require the markers to be set uniformly and to specification for reasons of beauty and maintenance, could require moulds to be of certain specifications as are thousands of construction items in the building world, and, as stated above, could require plaintiff to install under the supervision

of defendant at the site to make sure that it was done properly. Failure to comply with reasonable requirements would be grounds for barring future installations by the violator. Reasonable provisions for notice, requirement of a permit from defendant, and requirements as to specifications have been held valid in *Donohue v. Fitzsimmons,* 95 *N. J. Eq.* 125 (*Ch.* 1923), 32 *A. L. R.* 1406; 47 *A. L. R.* 70.

Finally, this court feels that the formula used in the breakdown of the $195 marker noted herein is a reasonable one. Thus, in addition to a reasonable charge for supervising the installation, defendant can require of the lot owner, as a condition to granting permission to install markers, the payment of other charges involved in the upkeep and replacement of the markers. Defendant has a right to maintain its park in excellent condition, and such charges would permit the maintenance and replacement of markers. It is to be noted that any lot owner may question in this court the reasonableness of any of the charges.

Turning to the defendant's counterclaim whereby the association seeks to enjoin the plaintiff from holding himself out as being connected with the defendants by the use of "Clover Leaf" and "Lake Nelson" as prefixes to plaintiff's bronze memorial or landscape companies, I find as a fact that plaintiff chose these names in anticipation of this suit. The totality of the evidence, including the juxtaposition of the competing operations and plaintiff's chagrin at being unable to consummate any bronze sales, impels this court to conclude that plaintiff's motive in denominating his prospective companies thusly was to harass the defendant and to mislead the public into assuming some sort of connection between the parties which is far from the reality of the situation. Plaintiff would urge upon this court the allegation that no confusion is imminent since the parties are engaged in diverse occupations. That such an argument is plainly spurious, one need but scan the complaint to realize that plaintiff's allegations to the contrary form the precise subject matter of this suit.

Furthermore, plaintiff relies upon the broad principle that a geographical name is not susceptible to exclusive appropriation by the defendant and therefore not apt to be protected by injunction. In dismissing the application of this contention to the facts educed herein, we need not conclude that defendant's use which is sought to be protected has acquired a secondary meaning in view of plaintiff's obvious attempt here to create a confusing similarity. *Delaware, L. & W. R. Co. v. Lackawanna Motor Freight Lines, Inc.,* 117 *N. J. Eq.* 385, 390 (*Ch.* 1934).

Vice-Chancellor Backes, in *Bayuk Cigars, Inc., v. Fine,* 112 *N. J. Eq.* 166, 168–169 (*Ch.* 1933) stated:

"The contention that other cigar manufacturers and jobbers use the name 'Philadelphia' as part of their trade-marks, and that the complainant has not an exclusive right to it, is met by the fact that the others are not simulating the complainants label, and it is also answered by the quotation in the cited case from *Clark Thread Co. v. Armitage,* 2 *Cir.,* 74 *F.* 936, 943: 'It does not follow, however, because the complainant is not exclusively entitled to use the words "Clark's Spool Cotton," that therefore it cannot rightfully enjoin a person who is fraudulently making use of its label * * *.' "

For these reasons, plaintiff is hereby enjoined from using defendant's name in the future and shall be compelled to cancel the certificates of trade names in violation of this mandate heretofore filed by him.

Finally, this court feels a compulsion to discuss at least in passing, a question which may not be adjudicated here because of the fact that plaintiff is not the proper party to raise the issue, but which has been brought to the fore by the evidence educed in this case. See Judge Conford's excellent and comprehensive opinion in *De Cristofaro v. Laurel Grove Memorial Park,* 43 *N. J. Super.* 244 (*App. Div.* 1957). This concerns not only the propriety but the very legality of the defendant's practice of including in the sales price of their bronze memorials a sum purportedly dedicated to the perpetual maintenance of the grave marker itself, but which actually finds its way into the general receipts of the association to be consumed by the operational

expenses incurred in the day-to-day management of the cemetery. Whether such a practice is in conformity with the peculiar trust relationships which are of the very nature of these associations would seem quite obviously open to question by the proper party, including a member of the association and the Department of Banking and Insurance under *R. S.* 8:2–36, 39 and 40. See also *Mack v. Passaic Nat. Bank & Trust Co.,* 134 *F. Supp.* 281 (*D. C. D. N. J.* 1955), on the advantages of having a separate perpetual care fund. This inquiry receives added impetus in view of the fact that the perpetual care funds, in respect of the plot itself, are the object of a trust. This court has strong feelings concerning the use of the perpetual care trust funds for the ordinary expenses of defendant but it would be unfair to make any determination—even in the form of *dictum*—without giving defendant an opportunity to justify the commingling of funds. What, offhand, might be considered improper may turn out to be most proper when evidence has been submitted. Nevertheless, the solution of this problem must needs be left to the parties possessing an interest in the management of the associations themselves.

Judgment accordingly will be drafted by defendant, submitted to plaintiff and thereafter submitted to the court.